**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
--------------------------------------------------------X
                          :

SHRAVANTI REDDY,            :

               Plaintiff,     :

    - against -            :

THE SALVATION ARMY,     :

             Defendant.    :

                          :
--------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 7/27/08

**OPINION AND ORDER**

**06 Civ. 5176 (SAS)**

**SHIRA A. SCHEINDLIN, U.S.D.J.:**

## I.     INTRODUCTION

Plaintiff Shravanti Reddy was born in India, moved to the United States as a child, and is currently a permanent resident. She worked at The Salvation Army ("TSA") from February 9, 2004 until January 13, 2005. Reddy alleges that during this period, her supervisor, Sarah Goldstein, discriminated against her by treating a Caucasian employee more favorably. Reddy also alleges that TSA retaliated against her by terminating her employment after she filed a complaint with TSA claiming discrimination. Reddy brings claims of disparate treatment and retaliation pursuant to section 1981 of title 42 of the United States Code ("section 1981") and Title VII of the Civil Rights Act of 1964 ("Title VII"),[1]

---

[1]     42 U.S.C. § 2000e et seq.

as well as New York Executive Law section 296 and New York City

Administrative Code section 8-107. TSA moves for summary judgment. For the

reasons stated below, TSA's motion is granted in part and denied in part.

## II. BACKGROUND

### A. Facts

Patricia DeLouisa hired Anna Raksaney, a Causasian female,[2] on

December 15, 2003 to work as a program analyst,[3] for TSA's Social Services for

Families and Adults ("SSFA"). SSFA is one of two social services programs in

New York City administered by TSA's Greater New York City Divisional

Headquarters ("TSA Headquarters").[4] Approximately two months later, Anne

Lown hired Reddy on February 9, 2004, to work as a program analyst in TSA

Social Services for Children ("SSC"), the other social services program

administered by TSA's Headquarters[5]

When she was initially hired, Reddy reported to Lown, the Associate

---

[2] *See* Plaintiff's Rule 56.1(b) Statement ("Pl. 56.1") ¶ 3.

[3] A program analyst is a professional writing position.

[4] *See* 4/21/08 Declaration of Patricia DeLouisa Langford, assistant director in charge of SSFA, in Support of Defendant's Motion for Summary Judgment ("DeLouisa Decl.") ¶ 5.

[5] *See id.* ¶ 4.

Executive Director in charge of SSC.[6]  Soon after hiring Reddy, Lown resigned,

leaving Reddy without a supervisor.[7]  In response, Goldstein sent Alfred Peck,

then Director of SSFA, an email on March 11, 2004, volunteering to "take on the

job of orienting . . . Reddy to [SSC]."[8]  In her email Goldstein expressed concern

that, because Reddy was without a supervisor, she would not adequately learn the

agency's regulations and policies.[9]

When Reddy and Raksaney were hired, the SSC and SSFA were two

separate social services programs.  The two programs were located in separate

buildings and operated independently of one another, each having separate

funding sources, human resource directors, and administrative departments.[10]

During the early part of 2004, in an attempt to streamline their operations, TSA

developed a plan to merge SSC with SSFA.[11]  Many departments were restructured

and certain jobs were eliminated.

---

[6]     *See* Pl. 56.1 ¶ 10.  Associate Executive Director was then the second highest director position at SSC.  *See id.*

[7]     *See id.*

[8]     *See id.*

[9]     3/11/04 Email from Goldstein to Peck, Ex. 1 to Defendant's Motion for Summary Judgment ("Def. Mem.").

[10]     *See* Pl. 56.1. ¶ 8.

[11]     *See* DeLouisa Decl. ¶ 8.

In April 2004, as part of the merger, Peck, recommended the formation of the Quality Assurance and Information Systems ("QAIS") Department.[12] Peck promoted Goldstein, a TSA employee for thirty-one years and a highly accomplished grant writer, to acting director of the QAIS Department.[13] Additionally, both Reddy and Raksany were incorporated into the newly formed QAIS Department. As a result, both Reddy and Raksaney submitted their weekly work plans and schedules to Goldstein for review.[14] Accordingly, Goldstein did not become Reddy's supervisor until late April 2004, only a few weeks before Reddy's three-month Initial Employment Period ("IEP") was due to expire.[15]

On May 4, 2004, Golstein sent a letter to Peck requesting that Reddy's IEP be extended.[16] According to the TSA's Employee Manual, the IEP is a three-month interval during which both TSA and a new employee can determine whether that person is right for the position.[17] During this time, an employee is

---

[12]    *See* Pl. 56.1 ¶ 12.

[13]    *See id.*

[14]    *See id.*

[15]    *See id.* ¶ 18.

[16]    *See id.* ¶ 19.

[17]    *See* Employment Policies Section of TSA Employee Manual, Ex. 1 to Def. Mem.

not eligible for benefits such as sick days, personal days, vacation, health benefits or life insurance.[18] Although Reddy's IEP was scheduled to end on May 9, 2004,[19] Goldstein sought permission to extend Reddy's IEP for an additional 90 days. Goldstein felt that because Reddy had been under her supervision for only two weeks, she did not have enough time to evaluate Reddy's work performance.[20] Additionally, Goldstein noted that Lown, Reddy's previous supervisor, resigned only a few weeks after Reddy was hired, leaving her essentially unsupervised during the ensuing period.[21] Both Peck and DeLouisa, found Goldstein's request warranted, and authorized the extension.[22]

In May 2004, Peck also directed Susan Impastato, Administrative Director of Support Services, to work with Goldstein and the program analysts to develop a plan for "Summer Fun," a summer daycare program for the children of

_____

[18]     *See id.*

[19]     *See* Pl. 56.1 ¶ 5.

[20]     *See* 4/20/08 Declaration of Sarah Goldstein, director of QAIS department, in Support of Defendant's Motion for Summary Judgment ("Goldstein Decl.") ¶ 2.

[21]     *See* 5/3/04 Memo from Goldstein to Reddy, Ex. 2 to Def. Mem.

[22]     *See* DeLouisa Decl. ¶ 25.

5

TSA staff.[23] Impastato, who worked with Reddy on the project, felt that Reddy lacked knowledge of TSA's programs, needed improvement in her writing skills, and was incapable of working independently.[24] Impastato discussed these concerns with Goldstein, who, in response, issued Reddy a Quality Improvement Memo.[25] On May 20, 2004, despite her view that the Quality Improvement Memo was unwarranted, Reddy "'apologize[d] for submitting work that did not meet the standards of the organization" and promised to "do everything in [her] power to alleviate any difficulties this has caused . . . .'"[26]

On June 1, 2004, the merger of SSFA and SSC was completed, at which time Goldstein became permanent director of the QAIS Department and Reddy and Raksany began sharing an office.[27] Soon after, Goldstein observed that morale was low in the new department.[28] According to DeLouisa, Raksany was

23      *See* Pl. 56.1 ¶ 45.

24      *See* 4/18/08 Declaration of Susan Impastato, Administrative Director of Support Services, in Support of Defendant's Motion for Summary Judgment ¶ 6.

25      *See* Pl. 56.1 ¶ 24.

26      *Id.* (quoting 5/24/04 Memo from Reddy to Goldstein, Ex. 2 to Def. Mem.).

27      *See id.* ¶¶ 12-13.

28      *See* DeLouisa Decl. ¶ 15.

6

unhappy because she was now reporting to someone lower in the chain of command as a result of the merger.[29] In what would also become a common complaint of Reddy's, Raksany often stated to others that she was unhappy having Goldstein as her supervisor, who she felt did not have the requisite skills and experience.[30]

Soon after becoming permanent director of QAIS, on June 7, 2004, Goldstein assigned Reddy the task of writing a new Procedures Manual, which involved combining sections of SSFA's and SSC's old manuals.[31] Reddy told Goldstein that she did not think that she should handle such a large project by herself.[32] Despite Raksany's offer to assist Reddy, Goldstein insisted that the project was Reddy's alone,[33] and that Reddy would be held responsible "for keeping the process going and making the actual manual happen ASAP."[34]

---

[29]    *See id.* ¶ 16.

[30]    *See id.* ¶ 17.

[31]    *See* Pl. 56.1 ¶ 25.

[32]    *See id.*

[33]    *See* 9/27/07 Deposition Testimony of Anna Raksany ("Raksany Dep.") at 86, Ex. 2 to 5/18/08 Declaration of Scott A. Korenbaum in Opposition to Defendant's Motion for Summary Judgment ("Korenbaum Decl.").

[34]    *See* Pl. 56.1 ¶ 25.

7

Over the next few months, Goldstein's supervisory style began to bother both Raksany and Reddy. As a result, on August 9, 2004, Raksany sent an email to DeLouisa requesting a meeting with both her and Reddy.[35] DeLouisa met with them on August 10, 2004, at which time they asked her to replace Goldstein as their supervisor.[36] Raksany informed DeLouisa that Goldstein was very controlling. Both she and Reddy intimated that they were upset because Goldstein often criticized their grammar in reviewing their work.[37] Reddy also voiced her displeasure with having received the Quality Improvement Memo.[38] When DeLouisa asked Reddy if she wanted DeLouisa to take action, however, Reddy declined, stating that she wanted the opportunity to try and work it out with Goldstein.[39]

Despite their meeting with DeLouisa, Reddy's and Raksany's problems with Goldstein persisted. On September 10, 2004, Reddy emailed Goldstein and DeLouisa complaining that Goldstein breached TSA's

---

[35]    *See* 8/9/04 Email from Raksany to DeLouisa, Ex. 4 to Def. Mem.

[36]    *See* DeLouisa Decl. ¶ 18.

[37]    *See id.*

[38]    *See id.* ¶ 19.

[39]    *See* Pl. 56.1 ¶ 27.

8

confidentiality requirements by telling Raksany that she had previously extended Reddy's IEP.[40] Goldstein immediately met with Reddy and apologized for her admittedly improper action,[41] to which Reddy responded via email, "I think we had a very productive discussion . . . I feel that all my concerns were addressed . . . and look forward to continuing to build a positive working relationship."[42]

Despite Reddy's apparent optimism, however, the working relationship continued to deteriorate, as Raksan, and Reddy continued to complain that Goldstein was not qualified to supervise the QAIS Department. Both program analysts found Goldstein's supervisory style overbearing, nitpicky, and intrusive. Both program analysts took umbrage at Goldstein's habitual correction of their grammar. Raksany, convinced that Goldstein's writing style was dated,[43] quickly tired of Goldstein's criticism of her grammar.[44] Although Raksany was often more vocal than Reddy in raising these complaints, it was Raksany's opinion that

---

[40]     *See id.* ¶ 31; Goldstein Decl. ¶ 6.

[41]     *See* Goldstein Decl. ¶ 6.

[42]     9/10/04 Email from Reddy to Goldstein, Ex. 7 to Def. Mem.

[43]     *See* Pl. 56.1 ¶ 29.

[44]     *See id.* On September 7, 2004, Goldstein corrected Raksany's grammar in an assignment Raksany prepared and offered to loan Raksany two grammar books. *See* 9/7/04 Email from Goldstein to Raksany, Ex. 13 to Def. Mem.

Goldstein "criticized Ms. Reddy much more than she criticized me in terms of Ms. Reddy's grammar and writing style . . . ."[45]

By November 2004, Raksany was becoming increasingly unhappy with Goldstein, seeing her as a "nosey" and needless "filter" in the chain of command.[46] In an effort to vent her frustrations, Raksany emailed DeLouisa a two-page, single spaced complaint on November 15, 2004, requesting a new supervisor and containing allegations that Goldstein was micro-managing, overbearing, incapable of building a supportive environment, unable to motivate, and that she failed to develop trust, eavesdropped, barged into the office she shared with Reddy, and made subtle insults.[47] In response, DeLouisa held another meeting with Raksany, this time with Goldstein in attendance, at which Raksany primarily restated these grievances.

Although Reddy did not attend this second meeting, she often echoed complaints similar to those of Raksany.[48] On December 3, 2004, Raksany forwarded Reddy the complaint she sent DeLouisa on November 15, 2004, and

---

[45]   Raksany Dep. at 39:22-24.

[46]   Pl. 56.1 ¶ 38.

[47]   *See id.* ¶ 39.

[48]   *See id.* ¶¶ 44, 47.

10

mentioned to Reddy that she had met with DeLouisa and Goldstein.[49]  Raksany

also told Reddy that she and DeLouisa had scheduled a follow-up meeting for

December 13, 2004 to discuss the supervision of the Program analysts.[50]  Pursuant

to this conversation, Reddy emailed DeLouisa and received permission to attend

the scheduled follow-up meeting.

By the time of the follow-up meeting, significant discord existed

between Goldstein, Reddy and Raksany.  The meeting was attended by Peck,

DeLouisa, Goldstein, Reddy, and Raksany.  During the meeting Raksany

complained at length that Goldstein was not a good supervisor and reiterated her

desire that she be given a new one.  Peck observed that Goldstein felt that her

supervision was being undermined,[51] and that both Raksany and Reddy were

subverting the chain of command in refusing to follow Goldstein's direction.[52]

Reddy and Raksany began working directly with the Directors for whom they

were writing grant proposals, thereby avoiding Goldstein's criticism[53]

---

[49]     *See id.* ¶ 46.

[50]     *See id.*

[51]     *See* 4/21/08 Declaration of Alfred Peck, Director of SSFA, in Support
of Defendant's Motion for Summary Judgment ("Peck Decl.") ¶ 9.

[52]     *See id.*

[53]     *See* DeLouisa Decl. ¶ 32.

11

Additionally, at this meeting, Goldstein criticized Reddy for not allowing her to review the final version of the Procedures Manual before it was printed. She blamed Reddy for the overall failure of the project.[54] Although the Procedures Manual was not actually due until December 17, 2004, it was clear that the project was moving slowly.[55]

Until Goldstein began to criticize her, Reddy had remained quiet throughout the meeting. However, when Goldstein asked her to contribute, Reddy opined that Goldstein was a poor supervisor and that she micro-managed and overly criticized her grammar, spelling, and punctuation.[56] Reddy also stated that any shortcomings related to the Procedures Manual project were also the fault of Goldstein, who refused Reddy's request for additional assistance on the project .[57] While the parties dispute some of the other comments allegedly made at this meeting, both sides agree that Reddy never stated that Goldstein was treating her differently on account of her race or national origin.[58]

---

[54]    *See* Pl. 56.1 ¶¶ 57-58.

[55]    *See* DeLouisa Decl. ¶ 31.

[56]    *See* Peck Decl. ¶ 10.

[57]    *See* Pl. 56.1 ¶ 58.

[58]    *See id.* ¶ 61.

A week later, on December 20, 2004, Peck issued a memo on to the QAIS Department placing the entire Department on disciplinary probation.[59] At the same time, he appointed Dan Lockspeiser, then Director of Programs, to investigate the discord within the Department.[60] Peck asked Lockspeiser to closely watch the Department and determine the true nature and causes of the interpersonal animosity.[61] During the three-month probationary period, Lockspeiser was to meet with the entire QAIS Department at least every two weeks, with each member of the Department at least twice and with Goldstein at least once a week.[62]

As part of his investigation, Lockspeiser met with Reddy on December 28, 2004. The parties, however, dispute what was said at this meeting. According to TSA, Reddy told Lockspeiser that she was uncomfortable having Goldstein as her supervisor because she felt that Goldstein micro-managed her, looked over her shoulder, criticized the quality of her work, and needlessly

---

[59]    *See* 12/20/04 Memo by Peck, Ex. 8 to Def. Mem. Reddy contends that Peck put the entire Department on probation, albeit not disciplinary probation. However, TSA only has two types of probation: disciplinary probation and initial probation. Accordingly, Peck put the entire QAIS Department on disciplinary probation. *See* 8/24/04 Administrator's Meeting Minutes, Ex. 13 to Def. Mem.

[60]    *See* Pl. 56.1 ¶ 71.

[61]    *See id.*

[62]    *See id.* ¶ 75.

13

corrected her grammar.[63]  Additionally, Reddy asked Lockspeiser to prohibit Goldstein from discussing general QAIS departmental information during their supervisory meetings.[64]  In response to this request, Lockspeiser advised Reddy to prepare guidelines for professional supervision for Goldstein to follow in an effort to facilitate an amicable, productive working relationship between the two.[65]  Lockspeiser expected these guidelines to define permissible conduct and topics of conversation during Reddy's meetings with Goldstein.[66]

Reddy, however, recalls a very different conversation.  Reddy testified that at around the time of the December 13, 2004 meeting, she started to think that Goldstein treated her differently, and often verbally attacked her, because of her race or national origin.  Furthermore, at the December 28, 2004 meeting, she told Lockspeiser that she thought Goldstein was discriminating against her.[67]  As a result of this perceived discrimination, Reddy told Lockspeiser

---

[63]    *See* 4/21/08 Declaration of Dan Lockspeiser, ex-Director of Programs, in Support of Defendant's Motion for Summary Judgment ("Lockspeiser Decl.").

[64]    *See* Pl. 56.1 ¶ 85.

[65]    *See id.*

[66]    *See id.*

[67]    *See* 1/1/08 Deposition Testimony of Shravanti Reddy ("Reddy Dep.") at 501:3-19, Ex. 1 to Korenbaum Decl.

14

that she no longer felt comfortable meeting with Goldstein. Reddy claims she then

asked Lockspeiser what he would do to address the situation. Lockspeiser

responded "that he didn't think it was serious enough for him to get involved at

[that] point."[68] Reddy reiterated that she was being discriminated against and

asked for a temporary supervisor while Lockspeiser investigated this allegation.

Lockspeiser told Reddy that a temporary supervisor would just be a "band-aid"

that would not solve the problem.[69] Reddy claims she then pressed further and

asked Lockspeiser whether he would change supervisors if she told him that she

was being sexually harassed by her current supervisor. Lockspeiser replied that if

faced with a sexual harassment complaint, he would contact Human Resources

and call security.[70] When she asked why racial or national origin discrimination is

any different, Reddy claims that Lockspeiser told her that if she really thought she

was being discriminated against, she should put her allegations in writing and send

it to him, at which time he would take action.[71] Lockspeiser does not recall any

discussion of discrimination during the meeting.

   Throughout November and December of 2004, Goldstein had

---

[68] *Id.* at 507:10-12.

[69] *See id.* at 507:17-19.

[70] *See id.* at 507:20-25.

[71] *See id.* at 508:4-10.

15

supervisory meetings with Reddy on Thursdays.[72] On December 30, 2004, Reddy

wrote an email to Goldstein stating, "I am not comfortable meeting with you until

I have formulated a list of professional guidelines that should be observed during

our supervisory meetings. I am suggesting a meeting of 1/5."[73] Confused as to the

appropriate response, Goldstein consulted Lockspeiser, who instructed her to

agree to Reddy's request.[74] Accordingly, Goldstein emailed Reddy and requested

that she submit her list of guidelines by January 4, 2005, so that she could have

time to review them prior to their meeting the following day.[75]

On January 3, 2005, Goldstein emailed Reddy requesting that they

meet regarding the Homeward Bound Proposal ("HBP"), a program for which

TSA was seeking funding.[76] Reddy had originally been assigned the task of

writing the grant proposal on December 21, 2004,[77] and had previously forwarded

a work plan to Goldstein, indicating that she would submit the completed proposal

---

[72]   *See* Pl. 56.1 ¶ 88.

[73]   12/30/04 Email from Reddy to Goldstein, Ex. 9 to Def. Mem.

[74]   *See* Pl. 56.1 ¶ 89.

[75]   *See id.*

[76]   *See id.* ¶ 90.

[77]   *See id.* ¶ 80.

to Goldstein by January 11, 2005.[78] In response, Reddy emailed Goldstein asking

her to place a document noting where corrections were needed on her desk.[79] A

few hours later, Reddy again emailed Goldtsein, this time saying that she did not

feel well and was going home.[80] Reddy stayed home for the next two days. Reddy

returned to work on January 6, 2005, but did not submit her proposed professional

guidelines.[81] The following day, Goldstein emailed Reddy, reminding Reddy that

she was still waiting to get the proposed guidelines and requesting that Reddy

meet with her at 2:00 p.m. to discuss the HBP, whose deadline was fast

approaching.[82] Reddy replied, "I will send you a list of guidelines within the

hour. In the meantime, I see no reason why you cannot explain the changes that

need to be made . . . in writing."[83] Later that afternoon, Reddy emailed Goldstein

her proposed professional guidelines,[84] which were now three days late.

According to TSA, by the time Reddy emailed Goldstein the professional

---

[78]    *See id.*

[79]    *See* 1/3/05 Email from Reddy to Goldstein, Ex. 10 to Def. Mem.

[80]    *See id.* ¶ 93.

[81]    *See id.* ¶ 95.

[82]    *See id.* ¶ 97.

[83]    1/7/05 Email from Reddy to Goldstein, Ex. 11 to Def. Mem.

[84]    *See* Pl. 56.1. ¶ 99.

17

guidelines, Reddy had refused to meet with her supervisor since December 30, 2004. Reddy characterizes this period differently, maintaining that she was only following Lockspeiser's direction and that none of her communications with Goldstein constituted a refusal to meet.

Additionally, Reddy sent Lockspeiser a letter on January 7, 2005, wherein she states for the first time in writing her allegations that Goldstein was discriminating against her.[85] However, because January 7, 2005 was a Friday, Lockspeiser did not actually see Reddy's letter until Monday, January 10, 2005,[86] at which point he hand-delivered a copy to Peck.[87] Lockspeiser did not share Reddy's letter with Goldstein.[88]

After reading Reddy's proposed professional guidelines and consulting with Lockspeiser, Goldstein emailed Reddy on January 10, 2005 to inform her that her guidelines were totally acceptable, and asked to meet that afternoon to discuss the guidelines and the HBP.[89] Reddy responded that the proposal was not yet ready, but that she would have it to Goldstein within a couple

---

[85]    *See id.* ¶ 98.

[86]    *See id.*

[87]    *See* Lockspeiser Decl. ¶ 45.

[88]    *See id.* ¶ 103.

[89]    *See id.* ¶ 101.

of days.[90] Reddy told Goldstein that she could meet with her briefly that afternoon, but "would prefer to have the time to continue working on the proposal," and suggested that they meet the following morning.[91] Although not thrilled, Goldstein agreed to postpone their meeting until January 11, 2005.[92]

On January 11, 2005, Goldstein met with Reddy and agreed to the professional guidelines Reddy had drafted. Goldstein then attempted to discuss the HBP. The parties dispute Reddy's response to Goldstein's request. According to TSA, Reddy refused to discuss work-related subjects at the meeting, and insisted that Goldstein only bring up work-related topics at their regular weekly supervisory meetings. TSA maintains that Reddy was only willing to discuss her professional guidelines, but not her current work projects. Conversely, Reddy states that she told Goldstein that other than their regular weekly supervisory meetings, she preferred to conduct business with Goldstein only by phone and email. Nonetheless, she would be willing to discuss work-related subjects in person "if it's absolutely needed."[93] This, Reddy asserts, demonstrates that she did not technically refuse to discuss work-related topics at the meeting. Despite the

---

[90]  *See* 1/10/05 Email from Reddy to Goldstein, Ex. 12 to Def. Mem.

[91]  *See id.*

[92]  *See id.*

[93]  Reddy Dep. at 668:1-2.

lack of work-related talk during the meeting, however, Reddy did manage to submit the first draft of the HBP to Goldstein later that day.

Also on January 11, 2005, Harold Weaver, a senior TSA employee (Director of Finance) and good friend of Lockspeiser, paid an unsolicited visit to the office shared by Reddy and Raksany. Weaver, who at the time held a position similar to Lockspeiser's in TSA's chain of command, told both Reddy and Raksany that he had heard their office was the "seditious office or mutinous office making complaints,"[94] and warned them that TSA "tends to squash those who complain."[95] Reddy wondered whether this comment was in response to the written complaint she sent Lockspeiser on January 7, 2005.

The following morning, Goldstein left Reddy a message asking her to come to her office to receive an assignment to type a two paragraph Critical Incident Report ("CIR") into a Microsoft Word Document. At the time she received the assignment, Reddy was aware that this was an extremely time sensitive project.[96] Prior to January 12, 2005, Goldstein had never assigned a CIR to one of the program analysts. However, despite the fact that, "[Raksany's]

---

[94]     Raksany Dep. at 111:23-24.

[95]     *Id.* at 113:4-5.

[96]     *See* 8/2/04 Email from Goldstein cc'ing Reddy, Ex. 13 to Def. Mem.

20

schedule was not nearly as demanding at that time,"[97] Goldstein decided that Reddy should transcribe the two paragraph assignment. In response to the message, Reddy sent Goldstein an email stating, "In our previous discussion, I explained that I am not comfortable meeting with you outside of our weekly supervisory meetings. Please send me the assignment you mentioned on the phone in writing through e-mail and/or place the document on my desk with a note describing what needs to be done."[98] Upon receiving Reddy's email, Goldstein left a handwritten note and left in Reddy's office.[99] In response, Reddy returned the CIR assignment to Goldstein, and sent her another email, this time stating, "As for the [CIR], I do not believe that this was an appropriate task for you to assign me. I am returning the document to you so that you can find someone more appropriate to complete it."[100]

Goldstein informed Lockspeiser that Reddy had refused to complete the CIR assignment. Goldstein asked Lockspeiser what she should do, since Reddy would not respect her authority, despite Goldstein's compliance with the professional guidelines Reddy had drafted. At this point, Lockspeiser was already

---

[97]    Raksany Dep. at 117:4-5.

[98]    1/12/05 Email from Reddy to Goldstein, Ex. 12 to Def. Mem.

[99]    *See* Pl. 56.1 ¶ 116.

[100]    1/12/04 Email from Reddy to Godlstein, Ex. 12 to Def. Mem.

aware that Reddy had initially refused to meet with Goldstein to receive the assignment, and suggested that terminating Reddy's employment may be necessary.[101]  Accordingly, on January 13, 2005, Goldstein prepared a letter to Peck requesting that Reddy be terminated for insubordination.  That same day, Goldstein and a security officer met with Reddy and she was summarily terminated.

TSA later invited Reddy to attend two conflict resolution meetings, one on January 20, 2005 and another on March 15, 2005, the purpose of which was to give Reddy the opportunity to discuss any concerns and issues she had related to her termination.[102]  Reddy did not attend either meeting.

## B.    Procedural Background

Reddy filed a charge with the Equal Opportunity Commission ("EEOC") alleging discriminatory conduct on April 11, 2005. The EEOC issued Reddy a right-to-sue letter on April 10, 2006.  Reddy initiated this action by filing a pro se complaint alleging claims of discrimination and retaliation under Title VII on July 7, 2006.  After retaining counsel, Reddy filed an amended complaint on March 26, 2007.

---

[101]    *See* Pl. 56.1 ¶ 125.

[102]    *See id.* ¶ 129.

## III. APPLICABLE LAW

### A. Summary Judgment

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."[103] An issue of fact is genuine "'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"[104] A fact is material when it "'might affect the outcome of the suit under the governing law.'"[105] "It is the movant's burden to show that no genuine factual dispute exists."[106]

In turn, to defeat a motion for summary judgment, the non-moving party must raise a genuine issue of material fact. To do so, it must do more than show that there is "'some metaphysical doubt as to the material facts,'"[107] and it

---

[103]   Fed. R. Civ. P. 56(c).

[104]   *Higazy v. Templeton*, 505 F.3d 161, 169 (2d Cir. 2007) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

[105]   *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 202 (2d Cir. 2007) (citing *Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005)).

[106]   *Vermont Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004) (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970)).

[107]   *Higazy*, 505 F.3d at 169 (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).

23

"'may not rely on conclusory allegations or unsubstantiated speculation.'"[108] However, "'all that is required [from a non-moving party] is that sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial.'"[109]

In determining whether a genuine issue of material fact exists, the court must construe the evidence in the light most favorable to the non-moving party and draw all justifiable inferences in that party's favor.[110] However, "[i]t is a settled rule that '[c]redibility assessments, choices between conflicting versions of the events, and the weighing of evidence are matters for the jury, not for the court on a motion for summary judgment.'"[111] Summary judgment is therefore inappropriate "'if there is any evidence in the record that could reasonably support

---

[108]    *Jeffreys*, 426 F.3d at 554 (quoting *Fujitsu Ltd. v. Federal Express Corp.*, 247 F.3d 423, 428 (2d Cir. 2002)).

[109]    *McClellan v. Smith*, 439 F.3d 137, 144 (2d Cir. 2006) (quoting *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288-89 (1968)).

[110]    *See Allstate Ins. Co. v. Hamilton Beach/Proctor Silex, Inc.*, 473 F.3d 450, 456 (2d Cir. 2007) (citing *Stern v. Trustees of Columbia Univ.*, 131 F.3d 305, 312 (2d Cir. 1997)).

[111]    *McClellan*, 439 F.3d at 144 (quoting *Fischl v. Armitage*, 128 F.3d 50, 55 (2d Cir. 1997)). *Accord Anderson*, 477 U.S. at 249.

24

a jury's verdict for the non-moving party.'"[112]

"[T]he salutary purposes of summary judgment – avoiding protracted, expensive and harassing trials – apply no less to discrimination cases than to commercial or other areas of litigation."[113] Courts within "'the Second Circuit have not hesitated to grant defendants summary judgment in such cases where . . . plaintiff has offered little to no evidence of discrimination.'"[114] Indeed, "'[i]t is now beyond cavil that summary judgment may be appropriate even in the fact-intensive context of discrimination cases.'"[115]

"However, greater caution must be exercised in granting summary judgment in employment discrimination cases where the employer's intent is genuinely at issue and circumstantial evidence may reveal an inference of

---

[112] *American Home Assurance Co. v. Hapag Lloyd Container Linie, GmbH*, 446 F.3d 313, 315 (2d Cir. 2006) (quoting *Marvel Characters, Inc. v. Simon*, 310 F.3d 280, 286 (2d Cir. 2002)).

[113] *Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 466 (2d Cir. 2001) (citing *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir. 1985)).

[114] *Big Apple Tire, Inc. v. Telesector Res. Group, Inc.*, 476 F. Supp. 2d 314, 324 (S.D.N.Y. 2007) (quoting *Alphonse v. State of Connecticut Dep't of Admin. Servs.*, No. Civ.3:02CV1195, 2004 WL 904076, at *7 (D. Conn. Apr. 21, 2004)).

[115] *Cooper v. State of Connecticut Pub. Defenders Office*, No. 07–1867-cv, 2008 WL 2228624, at *1 (2d Cir. May 28, 2008) (quoting *Abdu-Brisson*, 239 F.3d at 466).

discrimination."[116] This is so because "'[e]mployers are rarely so cooperative as to include a notation in the personnel file that the firing is for a reason expressly forbidden by law.'"[117] As a result, "affidavits and depositions must be carefully scrutinized for circumstantial proof which, if believed, would show discrimination."[118] But even where an employer's intent is at issue, "'a plaintiff must provide more than conclusory allegations of discrimination to defeat a motion for summary judgment.'"[119] "[A] party may not 'rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment.'"[120]

## B. Disparate Treatment

Title VII makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to [her] compensation terms, conditions, or privileges of employment,

---

[116]     *Belfi v. Prendergast*, 191 F.3d 129, 135 (2d Cir. 1999).

[117]     *Holcomb v. Iona Coll.*, 521 F.3d 130, 141 (2d Cir. 2008) (quoting *Ramseur v. Chase Manhattan Bank*, 865 F.2d 460, 464-65 (2d Cir. 1989)).

[118]     *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir. 1997).

[119]     *Pipkin v. Bridgeport Bd. of Educ.*, 159 Fed. Appx. 259, 261 (2d Cir. 2005) (quoting *Schwapp*, 118 F.3d at 110).

[120]     *Lipton v. Nature Co.*, 71 F.3d 464, 469 (2d Cir. 1995) (quoting *Knight v. United States Fire Ins. Co.*, 804 F.2d 9, 11-12 (2d Cir. 1986)).

because of such individual's race, color, religion, sex, or national origin . . . ."[121]

A Title VII disparate treatment claim can be asserted if an employer treats

someone "less favorably than others because of [her] race, color . . . religion" or

other protected characteristic.[122]  The Supreme Court has established an

"allocation of the burden of production and an order for the presentation of proof

in Title VII discriminatory-treatment cases."[123]  Where, the plaintiff has not

alleged any direct evidence of discrimination, the plaintiff must proceed under the

burden-shifting framework developed in *McDonnell Douglas Corp. v. Green*.[124]

Under the *McDonnell Douglas* framework, a plaintiff must first prove

a prima facie case of discrimination.[125]  To establish a prima facie case of disparate

---

[121]    42 U.S.C. § 2000e-2 (2003).

[122]    *Hazen Paper Co. v. Biggins*, 507 U.S. 604, 609 (1993).

[123]    *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506 (1993).
Discrimination claims brought pursuant to section 1981 are analyzed under the
same framework as those brought under Title VII. *See Pierce v. Netzel*, No. 04-
5606, 2005 WL 2016010, at *1 (2d Cir. Sept. 9, 2005).  Furthermore, claims
brought under New York State and New York City human rights laws are also
analyzed under the same burden-shifting approach used in Title VII claims. *See
Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 565 n.1 (2d Cir. 2000).  As a result, all
of Reddy's disparate treatment and retaliation claims brought pursuant to section
1981 and state and city law will be analyzed in accordance with the same three-
part evidentiary framework applicable to her Title VII claims.

[124]    411 U.S. 792 (1973).

[125]    *See id.* at 802.

27

treatment, a plaintiff must show that: (1) she is a member of a protected class; (2) she was qualified for the position she held;[126] (3) she was subject to an adverse employment action;[127] and (4) the adverse action occurred under circumstances

[126] Under the *McDonnell-Douglas* framework, only a minimal showing of qualification for the position at issue is required to establish a prima facie case. *See de la Cruz v. New York City Human Res. Admin. Dep't of Soc. Servs.*, 82 F.3d 16, 20-21 (2d Cir. 1996) (citation omitted). Plaintiff "need not demonstrate that [her] performance was flawless or superior. Rather, [she] need only demonstrate that [she] possesses the basic skills necessary for the performance of [the] job." *Douglas v. District Council 37 Mun. Educ. Fund Trust*, 207 F. Supp. 2d 282, 289 (S.D.N.Y. 2002) (internal quotation marks and citation omitted). Indeed, "the fact that the employer has already hired the employee, and retained the employee for a significant period of time, support [sic] the inference that the employee was minimally qualified for the job." *Branson v. Ethan Allen, Inc.*, No. 02 CV 6588, 2004 WL 2468610, at *5 (E.D.N.Y. Nov. 3, 2004).

[127] In the Second Circuit, an employee experiences an adverse employment action where she endures a "materially adverse change" in the terms or conditions of employment. *Galabya v. New York City Bd. of Educ.*, 202 F.3d 636, 640 (2d Cir. 2001). Materially adverse employment actions include "'termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices . . . unique to a particular situation.'" *Id.* (quoting *Crady v. Liberty Nat'l Bank and Trust Co.*, 993 F.2d 132, 136 (7th Cir. 1993)). However, to qualify as "materially adverse," a change in employment conditions must be "more disruptive that a mere inconvenience or an alteration of job responsibilities." *Id.* (quotation marks omitted). It is important to note that adverse employment actions in the context of discrimination claims cover a narrower range of conduct than in the context of retaliation claims. *See Gentile v. Potter*, 509 F. Supp. 2d 221, 238-39 (E.D.N.Y. 2007). An adverse employment action in the context of a disparate treatment claim is limited to actions that affect the terms and conditions of employment. *See Paulose v. New York City Dep't of Educ.*, No. 05 Civ. 9353, 2007 WL 1371517, at *9 (S.D.N.Y. May 10, 2007).

giving rise to an inference of discrimination.[128] The evidence necessary to establish a prima facie case has been characterized as "minimal" and "*de minimus*."[129]

A common way for plaintiffs to establish a prima facie case of discrimination is to demonstrate the disparate treatment of other similarly situated employees.[130] "Where 'a plaintiff seeks to make out her prima facie case by pointing to the disparate treatment of a purportedly similarly situated employee, the plaintiff must show that she shared sufficient employment characteristics with that comparator so that they could be considered similarly situated.'"[131] While not obligated to show disparate treatment of an identically situated employee,[132] in order to be "similarly situated," a plaintiff must demonstrate that the individual(s)

---

[128] *See Feingold v. New York*, 366 F.3d 138, 152 (2d Cir. 2004).

[129] *Zimmerman v. Associates First Capital Corp.*, 251 F.3d 376, 381 (2d Cir. 2001).

[130] *See Abdu-Brisson*, 239 F.3d at 468 (stating that a showing of disparate treatment is a "common and especially effective method" of establishing the fourth element of a prima facie case of discrimination).

[131] *Lee v. Healthfirst, Inc.*, No. 04 Civ. 8787, 2007 WL 634445, at *32 (S.D.N.Y. Mar. 1, 2007) (quoting *McGuinness v. Lincoln Hall*, 263 F.3d 49, 53 (2d Cir. 2001)).

[132] *See McGuiness*, 263 F.3d at 54.

with whom she compares herself are similarly situated in all material respects.[133]

Thus, "where a plaintiff seeks to establish the minimal prima facie case by making

reference to the disparate treatment of other employees, those employees must

have a situation sufficiently similar to plaintiff's to support at least a minimal

inference that the treatment may be attributable to discrimination."[134]

If the plaintiff establishes a prima facie case, "a presumption of

discrimination is created and the burden of production shifts to the defendant to

articulate some legitimate, nondiscriminatory reason for the adverse employment

action."[135] In carrying this burden, "the defendant need not prove by a

preponderance of the evidence that the reasons for its actions were not

discriminatory . . . [T]he defendant must simply present clear and specific non-

discriminatory reasons for its actions."[136] If the employer articulates a non-

discriminatory reason for its actions, the presumption of discrimination is rebutted,

---

[133]    *See Shumway v. United Parcel Service, Inc.*, 118 F.3d 60, 64 (2d Cir. 1997).

[134]    *McGuiness*, 263 F.3d at 54.

[135]    *Farias v. Instructional Sys., Inc.*, 259 F.3d 91, 98 (2d Cir. 2001) (citation omitted).

[136]    *Lee*, 2007 WL 634445, at *33 (citing *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254-58 (1981)).

and the presumption "'simply drops out of the picture.'"[137]

The plaintiff must then "'prove that the legitimate reasons offered by the [employer] were not its true reasons [for the adverse employment action], but were a pretext for discrimination.'"[138] To meet this burden, a plaintiff may not merely show that she satisfies the minimal requirements of a *McDonnell-Douglas* prima facie case.[139] Rather, for a plaintiff to survive summary judgment, there must be "sufficient evidence in the record from which a reasonable trier of fact could find in favor of plaintiff on the ultimate issue, that is, whether the record contains sufficient evidence to support an inference of discrimination."[140]

## C.    Retaliation

Employers violate Title VII when "'a retaliatory motive plays a part in adverse employment actions toward an employee, whether or not it was the sole

---

[137]    *Forde v. Beth Israel Med. Center*, 546 F. Supp. 2d 142, 150 (S.D.N.Y. 2008) (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 510-11 (1993)).

[138]    *Mambru v. Inwood Cmty. Servs., Inc.*, No. 06 Civ. 2155, 2007 WL 4048007, at *3 (S.D.N.Y. Nov. 13, 2007) (quoting *Woodman v. WWOR-TV, Inc.*, 411 F.3d 69, 76 (2d Cir. 2005)).

[139]    *See Forde*, 546 F. Supp. 2d at 150.

[140]    *Id.*

cause.'"[141] Moreover, "Title VII is violated when an employer is motivated by

retaliatory animus, even if valid objective reasons for the discharge exist.[142] The

*McDonnell-Douglas* burden shifting analysis used in Title VII discrimination

claims applies to retaliation claims brought pursuant to Title VII.[143] Thus, "[a]

plaintiff raising a claim of [retaliation] has a similar burden of initially

establishing a prima facie case of retaliation."[144] To establish a prima facie case of

retaliation, a plaintiff must show that: (1) she was engaged in protected activity;[145]

---

[141]    *Terry v. Ashcroft*, 336 F.3d 128, 141 (2d Cir. 2003) (quoting *Cosgrove v. Sears, Roebuck & Co.*, 9 F.3d 1033, 1039 (2d Cir. 1993)).

[142]    *Cosgrove*, 9 F.3d at 1039 (citations omitted).

[143]    *See Terry*, 336 F.3d at 141 (citing *Reed v. A.W. Lawrence & Co., Inc.*, 95 F.3d 1170, 1178 (2d Cir. 1996)).

[144]    *Collins v. New York City Transit Auth.*, 305 F.3d 113, 118 (2d Cir. 2002) (citation omitted).

[145]    "For a plaintiff's conduct to constitute participation in a protected activity, it is enough that she has made 'informal protests of discrimination, including making complaints to management . . . so long as the employee has a good faith, reasonable belief that the underlying challenged actions of the employer violated the law.'" *Lee*, 2007 WL 634445, at *72 n.23 (quoting *Gregory v. Daly*, 243 F.3d 687, 700-01 (2d Cir. 2001)). *Accord Middleton v. Metropolitan College of New York*, 545 F. Supp. 2d 369, 373 (S.D.N.Y. 2008) (quoting *Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 769 (2d Cir. 1998)) (stating that "[t]o prove participation in a protected activity, a plaintiff need only demonstrate that she had a 'good faith, reasonable belief that the underlying challenged actions of the employer violated the law,' not that the employer's conduct actually violated the law").

(2) the employer was aware of that activity; (3) she suffered an adverse employment action;[146] and (4) there was a causal connection between the connected activity and the adverse employment action.[147] If a plaintiff succeeds in making out a prima facie case of retaliation, "the burden shifts to the employer to 'articulate legitimate non-discriminatory reasons for its actions, whereupon the plaintiff bears the burden of showing that the defendant's explanations are pretext for the true discriminatory motive.'"[148]

## IV. DISCUSSION

### A. Disparate Treatment

Reddy argues that TSA discriminated against her by treating her differently in the terms and conditions of her employment than a similarly situated Caucasian employee (Raksany). Specifically, Reddy claims that she was criticized more than Raksany, treated more harshly than Raksany, and assigned a heavier workload than Raksany. Reddy also claims that her grammar, spelling and

---

[146] In *Burlington Northern and Santa Fe Railway Co. v. White*, the Supreme Court stated that, in the context of retaliation claims, an adverse employment action is one which might dissuade a reasonable employee from making or supporting a charge of discrimination. 548 U.S. 53, 68 (2006).

[147] *See Collins*, 305 F.3d at 118 (citation omitted).

[148] *Lee*, 2007 WL 634445, at *71-72 (quoting *Holt v. KMI-Continental, Inc.*, 95 F.3d 123, 130 (2d Cir. 1996)).

punctuation was scrutinized more closely than Raksany's, and that her IEP was unnecessarily extended when Raksany's was not.

Reddy has satisfied the first two elements of her prima facie case. Neither party disputes that Reddy, a woman of Indian national origin, is a member of more than one protected class. Additionally, Reddy has shown for the pupose of this motion that she is qualified to hold the position of program analyst, if only because TSA retained Reddy in that position for more than nine months prior to her termination.

## 1. Adverse Employment Action / Inference of Discrimination

Reddy contends that Goldstein discriminated against her by extending her IEP, which was scheduled to expire on May 9, 2004, for an additional three months. The first question, then, is whether an extension of Reddy's IEP qualifies as an adverse employment action. TSA asserts that it does not, arguing that Reddy cites no "materially adverse change" which resulted from the extension.

I conclude, as a matter of law, that the extension of the IEP was not an adverse employment action. During the first three months of her IEP, Reddy, like all new TSA employees, was not eligible for benefits such as sick days, personal days, vacation, health benefits or life insurance. However, at the end of those first three months, Reddy automatically became eligible to receive those

34

benefits, despite Goldstein's decision to extend her IEP. TSA policy mandates that although an employee's IEP may be extended an additional three months, "benefits, vacation and leave time will start" at the end of the first IEP. Because Goldstein's decision to extend Reddy's IEP did not materially affect the terms and conditions of her employment, it does not constitute an adverse employment action in the context of a discrimination claim.[149]

However, even if Goldstein's decision to extend Reddy's IEP did constitute an adverse employment action, Reddy fails to offer any evidence suggesting that Goldstein extended her IEP under circumstances giving rise to an inference of discrimination. To the extent that Reddy seeks to demonstrate an inference of discrimination by comparing herself to Raksany, Reddy must first establish that she and Raksany were similarly situated. Reddy has failed to do so in relation to the extension of her IEP. DeLouisa hired Raksany on December 15, 2003, and supervised her during her entire IEP, which expired on March 15, 2004.[150] By the time that Raksany was transferred to QAIS and came under the supervision of Goldstein, she had already successfully completed her IEP. Thus,

---

[149]    *See McNichols v. Miami-Dade County*, No. 02-23034-CIV, 2006 WL 1104336, at *11 (S.D. Fla. Mar. 24, 2006) (finding that a three-month extension of the plaintiff's probationary period did not qualify as an adverse employment action).

[150]    *See* Pl. 56.1 ¶ 16.

35

Goldstein did not play any role in deciding whether Raksany should be removed from IEP. Conversely, Lown hired Reddy on February 9, 2004, but resigned shortly after hiring Reddy, leaving Reddy without a supervisor to review her work until late April 2004, when Goldstein assumed that responsibility. Where Raksany had three full months of supervision under one supervisor, Reddy had no more than a couple weeks under Goldstein's supervision. Consequently, in relation to their IEP's, Reddy and Raksany were not similarly situated in all material respects because they had different supervisors during their first three months at TSA. Reddy therefore fails to make a showing that the extension of her IEP occurred under circumstances giving rise to an inference of discrimination.

### 2. Breach of Confidentiality Requirement

Reddy contends that Goldstein discriminated against her by violating TSA's confidentiality requirements when Goldstein informed Raksany that she had extended Reddy's IEP.[151] This breach of a confidentiality requirement cannot constitute an "adverse employment action." In the context of a discrimination claim, only "'a materially adverse change in the terms and conditions of employment'" will satisfy the third prong of a prima facie case.[152] By requiring

---

[151]    *See* Amended Complaint ("Am. Compl.") ¶ 16.

[152]    *Weeks v. New York State (Div. of Parole)*, 273 F.3d 76, 85 (2d Cir. 2001) (quoting *Galabya*, 202 F.3d at 640).

that the employment action be materially adverse, the Second Circuit has indicated that the employer's action at issue must "'affect[] [plaintiff's] employment in a way that is both detrimental and substantial.'"[153]

Reddy, has produced no evidence demonstrating that Goldstein's breach of confidentiality affected a materially adverse change in the terms and conditions of her employment. In fact, the evidence produced indicates that the breach had little to no effect on the terms and conditions of Reddy's employment. After learning of the breach, Reddy emailed Goldstein to express her disappointment, inform Goldstein that she thought her actions were improper, and repair any damage that may have been done to their working relationship.[154] Less than two hours after receiving the email, Goldstein had already met with Reddy and apologized for breaching Reddy's confidentiality.[155] Reddy then informed Goldstein that she thought their discussion was "very productive" and felt that "all [her] concerns were addressed," as she felt "assured that such incidents [would] not occur in the future and look[ed] forward to continuing to build a positive

---

[153] *Satterfield v. United Parcel Service, Inc.*, No. 00 Civ. 7190, 2003 WL 22251314, at *9 (S.D.N.Y. Sept. 30, 2003) (quoting *Weeks*, 273 F.3d at 87).

[154] *See* 9/10/04 Email from Reddy to Goldstein, Ex. 7 to Def. Mem.

[155] *See* Pl. 56.1 ¶ 31.

37

working relationship."[156] In the absence of evidence demonstrating a tangible effect on the terms and conditions of Reddy's employment, Goldstein's breach of confidentiality does not establish a prima facie case of disparate treatment.

## 3. Undue Criticism and Hostility

Reddy contends, in a somewhat disjointed fashion, that Goldstein discriminated against her by criticizing her more than Raksany. Specifically, Reddy asserts that she was unjustifiably subjected to a level of scrutiny and open hostility that Raksany did not experience. According to Reddy, "Goldstein often spoke . . . in a condescending and belittling tone" and would "repeatedly inform Ms. Reddy that her grammar and writing skills were lacking."[157] Reddy cites various examples in an effort to demonstrate the alleged disparity in Goldstein's treatment of the two program analysts, including an email Goldstein sent to her listing numerous corrections to "Meeting Minutes" Reddy prepared, as well as an email Goldstein sent to Raksany regarding a similar assignment.[158] Reddy contends that the email sent to her was "stern and accusatory," while the email

---

[156] 9/10/04 Email from Reddy to Goldstein, Ex. 7 to Def. Mem.

[157] Pl. 56.1 ¶ 137.

[158] *See* 5/25/04 Email from Goldstein to Reddy, Ex. C to 5/18/08 Declaration of Shravanti Reddy ("Reddy Decl.") in Opposition to Defendant's Motion for Summary Judgment; 9/7/04 Email from Goldstein to Raksany, Ex. C to Reddy Decl.

Goldstein sent to Raksany was positive.[159]  Reddy cites numerous other instances,

including: (1) the December 13, 2004 meeting, when Goldstein allegedly raised

"false allegations regarding [her] work on the Procedures Manual";[160] (2)

Goldstein's alleged statement to Raksany that she was a better writer than Reddy,

and Goldstein's alleged related request that Raksany proofread Reddy's work; and

(3) the Quality Improvement Memo that Reddy received in May 2004.

These allegations, however, do not constitute adverse employment

actions because, as TSA correctly notes, Goldstein's alleged criticism and

increased scrutiny of Reddy did not result in materially adverse changes in the

terms and conditions of her employment.  Even if the allegations of criticism,

hostility and scrutiny could be characterized as unfair and unwarranted, "it is well

established that allegations of unfair criticism . . . unaccompanied by an allegation

that the criticism negatively impacted the terms or conditions of a plaintiff's

employment cannot constitute an adverse employment action."[161]  The Second

Circuit has clearly articulated that "criticism of an employee (which is part of

training and necessary to allow employees to develop, improve and avoid

---

[159]     Pl. 56.1 ¶ 138.

[160]     Reddy Decl. ¶ 15.

[161]     *Wilson v. New York City Dep't of Transp.*, No. 01 Civ. 7398, 2005
WL 2385866, at *18 (S.D.N.Y. Sept. 28, 2005).

discipline) is not an adverse employment action."[162] Although Reddy repeatedly

makes the bald accusation that Goldstein's criticism of her work was factually

inaccurate and unjustified, she has failed to produce evidence demonstrating that

the criticism caused any materially adverse change in the conditions of her

employment, such as lost wages or benefits.

Similarly, neither Reddy's allegation that Goldstein used a belittling

and condescending tone when communicating with her, nor the assertion that

Goldstein scrutinized her performance more closely than Raksany's constitutes an

adverse employment action.[163] As this Court has noted, "although reprimands and

---

[162]    *Weeks*, 273 F.3d at 86. *Accord Gourdine v. Cabrini Med. Center*, 307
F. Supp. 2d 587, 597 (S.D.N.Y. 2004) (stating that plaintiff's allegations that she
was openly criticized was not actionable under Title VII because criticism of an
employee's work that is not race-related does not amount to an adverse
employment action).

[163]    *See Hubbard v. Port Auth. of New York and New Jersey*, No. 05 Civ.
4396, 2008 WL 464694, at *12 (S.D.N.Y. Feb. 20, 2008) ("'[C]ourts in this circuit
have found that reprimands and . . . excessive scrutiny do not constitute adverse
employment actions in the absence of other negative results such as a decrease in
pay or being placed on probation.'" (quoting *Uddin v. City of New York*, 427 F.
Supp. 2d 414, 419 (S.D.N.Y. 2006))); *Sangan v. Yale Univ.*, No. 3:06CV00587,
2008 WL 350626, at *4 (D. Conn. Feb. 7, 2008) (noting that the defendant's
conduct towards the plaintiff, "which could be found to be offenseive,
discourteous, demeaning and/or belittling," did not constitute an adverse
employment action); *Smalls v. Allstate Ins. Co.*, 396 F. Supp. 2d 364, 371
(S.D.N.Y. 2005) (noting that "being yelled at" and receiving unfair criticism do
not constitute adverse employment actions) (citation and internal quotation marks
omitted); *Johnson v. State of Connecticut, Dept. of Corrs.*, 392 F. Supp. 2d 326,
340 (D. Conn. 2005) (finding that the "routine ridicule" that the plaintiff allegedly

40

close monitoring may cause an employee embrassment or anxiety, such intangible consequences are not materially adverse alterations of employment conditions."[164]

Finally, it is well established that the Quality Improvement Memo that Reddy received does not constitute an adverse employment action. For example, in *Weeks*, the plaintiff, a former parole officer, claimed that receiving a "notice of discipline" for misconduct and incompetence for failing to have her handcuffs and weapon, and a "counseling memo" for her procedure for taking a parolee into custody constituted an adverse employment action.[165] The Second Circuit disagreed, noting that the plaintiff failed to show that either document created a materially adverse change in her working conditions.[166] So too, Reddy has not produced evidence demonstrating that the Quality Improvement Memo

---

suffered did not, without more, rise to the level of an adverse employment action); *Nicastro v. Runyon*, 60 F. Supp. 2d 181, 186 (S.D.N.Y. 1999) (holding that excessive scrutiny by supervisors does not constitute an adverse employment action under Title VII).

[164] *Castro v. New York City Bd. of Educ. Pers.*, No. 96 Civ. 6314, 1998 WL 108004, at *7 (S.D.N.Y. Mar. 12, 1998).

[165] *Weeks*, 273 F.3d at 86.

[166] *See id. See also Knight v. City of New York*, 303 F. Supp. 2d 485, 497 (S.D.N.Y. 2004) ("Disciplinary memoranda and evaluations are adverse employment actions only if they affect ultimate employment decisions such as promotions, wages or termination.") (citation and internal quotations marks omitted).

negatively affected the terms and conditions of her employment. Consequently, this allegation of disparate treatment also fails to satisfy the third prong of a prima facie case of discrimination.

### 4.    Timesheets

Initially, Reddy claimed that Goldstein discriminated against her by making her sign in every day despite not making Raksany do so. Even if Raksany and Reddy were similarly situated in respect to their timesheets, Reddy's allegation would still be insufficient to establish a prima facie case of discrimination. Because Reddy has failed to describe the negative effect or ramifications of filling out timesheets on the terms of her employment, this cannot constitute a materially adverse change in her working conditions.[167]

Moreover, Reddy's claim that Raksany did not have to sign in is factually inaccurate. TSA has submitted evidence that even after the merger was complete, the finance and payroll departments for SSC and SSFA remained separate.[168] The two payroll and finance departments did not merge until after

---

[167]    *See Presley v. Pepperidge Farm, Inc.*, 356 F. Supp. 2d 109, 132 (D. Conn. 2005) (finding that the defendant's requirement that plaintiff fill out a time sheet for one week did not consitute an adverse employment action in the absence of evidence demonstrating that the plaintiff's working conditions were adversely affected by that requirement).

[168]    *See* DeLouisa Decl. ¶ 8; Def. Mem. at 9.

TSA terminated Reddy's employment.[169]  In fact, Raksany was required to sign

timesheets.  The only difference was that Reddy's timesheets remained with

Goldstein, while Raksany's were located outside Peck's office.[170]

Reddy admits that she was unaware of this administrative structure,[171]

and has not denied TSA's assertions, nor presented evidence refuting them.

Accordingly, Reddy has essentially abandoned the timesheet claim.

## B.    Retaliation

### 1.    Prima Facie Case of Retaliation

The first question is when did Reddy engage in the "protected

activity" of notifying TSA of her allegation of discrimination.  TSA asserts that

Reddy's first allegation of discrimination was the letter she sent to Lockspeiser on

January 7, 2005, in which she claimed that Goldstein behaved in a "differential

manner" towards her in comparison to "other employees."[172]  In that letter, Reddy

expressed her belief that Goldstein's alleged differential treatment "may be based

---

[169]    *See* DeLouisa Decl. ¶ 8.

[170]    *See id.*

[171]    *See* Pl. 56.1 ¶ 134.

[172]    1/7/05 Email from Reddy to Lockspeiser, Ex. 11 to Def. Mem.

on Ms. Goldstein's bias concerning [her] race and/or national origin."[173] Reddy, by contrast, claims that although the January 7th letter was the first time she committed her allegations to writing, she had previously discussed her concerns with Lockspeiser on December 28, 2004.[174] In fact, Reddy asserts that it was Lockspeiser who, at the end of a meeting in which Reddy summarized the complaints she had raised in previous emails, directed her to put her concerns in writing so that he could "take action."[175]

Viewing all facts in the light most favorable to Reddy, I shall assume that she engaged in "protected activity" of which TSA was aware on December 28, 2004. Raksany also testified that she thought Goldstein treated her more favorably than she treated Reddy.[176] Although Raksany did not believe that Goldstein treated her differently because she is Caucasian, she could not provide any other reason for the disparate treatment.

Reddy has also satisfied the third and fourth prongs of a prima facie retaliation claim. Reddy has established that she was subjected to a materially

---

[173]   *Id.*

[174]   *See* Reddy Dep. at 501:3-19.

[175]   *Id.* at 508:4-16.

[176]   *See* Raksany Dep. at 39:3-7.

adverse employment action when TSA terminated her employment less than three

weeks after she lodged her oral complaint of discrimination with Lockspeiser (or

less than one week after she committed her allegations to writing, as TSA

contends).[177] Furthermore, the short interval between the protected activity and

the adverse employment action would permit a reasonable trier of fact to find a

causal connection between the two.[178]

To rebut this argument, TSA cites *Korelis v. Ramada Hotel*,[179] and

*Augustin v. The Yale Club of New York City*, [180] but neither case supports its

position. In *Korelis*, plaintiff's allegation of discrimination preceded his

termination by approximately ten months.[181] In *Augustin*, the court noted that

plaintiff's evidence raised "serious questions" regarding whether she could satisfy

the fourth prong of a prima facie retaliation claim based on the temporal

---

[177]   *See Morris v. Lindau*, 196 F.3d 102, 111 (2d Cir. 1999)
("Termination . . . obviously qualifies as an adverse employment action.").

[178]   *See Gordon v. New York City Bd. of Educ.*, 232 F.3d 111, 117 (2d
Cir. 2000) (stating that a causal connection may be established by showing that
"the protected activity was followed closely by discriminatory treatment").

[179]   Nos. 91 Civ. 6539, 92 Civ. 1284, 1996 WL 204469 (S.D.N.Y. Apr.
26, 1996).

[180]   No. 03-CV-1924, 2006 WL 2690289 (S.D.N.Y. Sept. 15, 2006).

[181]   *See Korelis*, 1996 WL 204469, at *7.

45

connection between her complaints of a hostile work environment and her termination (20 days).[182] Yet, for purposes of establishing a prima facie case, the court still assumed that the causal connection requirement was satisfied.[183]

Finally, TSA notes that "[w]here timing is the only basis for a claim of retaliation, and gradual adverse job actions began well before the plaintiff had ever engaged in any protected activity, an inference of retaliation does not arise."[184] TSA points out that the entire QAIS Department was placed on disciplinary probation, which TSA characterizes as a "tool for progressive discipline,"[185] on December 20, 2004, prior to Reddy having lodged her discrimination complaint with Lockspeiser. Because a gradual adverse job action began before Reddy engaged in protected activity, TSA argues, there is no credible inference of retaliation.

TSA is mistaken. TSA never relieved Reddy of job responsibilities,

---

[182]   *See Augustin*, 2006 WL 2690289, at *26.

[183]   *See id.*

[184]   *Slattery v. Swiss Reinsurance Am. Corp.*, 248 F.3d 87, 95 (2d Cir. 2001) (noting that not only was plaintiff first relieved of his management responsibilities, and then individually placed on probation, but was also told, approximately one month before being terminated, that he would be terminated if he did not begin to generate new business, which he did not do).

[185]   8/24/04 Minutes to TSA Administrators' Meeting, Ex. 13 to Def. Mem.

nor did it place her on disciplinary probation. Accordingly, TSA did not institute gradual adverse job actions against Reddy, nor did it warn her that she faced imminent termination based on her job performance.

## 2. TSA's Rationale for Termination

TSA argues it terminated Reddy's employment when she refused to meet with Goldstein and accept written assignments from her. Specifically, TSA points to Reddy's refusal to complete the Critical Incident Reports that Goldstein assigned her on January 12, 2005. Although Reddy denies that she returned the document without speaking to Goldstein, her email sent at 3:45 p.m. demonstrates a clear refusal to follow Goldstein's instructions.[186] Reddy's alleged insubordination is a legitimate justification for TSA's termination of employment.

## 3. Pretext

Reddy attempts to demonstrate that TSA's declared reason for terminating her employment (*i.e.* her insubordination) is pretextual, arguing that her refusal to complete the Critical Incident Reports and her alleged refusals to meet with Goldstein do not constitute insubordination.

---

[186]    *See* 1/12/05 Email from Reddy to Goldstein, Ex. 12 to Defendant's Motion for Summary Judgment ("As for the Critical Incident Report, I do not believe that this was an appropriate task for you to assign me. I am returning the document to you so that you can find someone more appropriate to complete it.").

Additionally, Reddy claims that on January 11, 2005, Weaver entered the office shared by Reddy and Raksany and referred to their office as the "rebellious" and "seditious" office, stating that "he knew what was going on, he had spoken to [Lockspeiser]," and that the "Salvation Army tends to squash people who speak up."[187] Raksany's testimony regarding Weaver's comments corroborates Reddy's account.[188] Reddy also claims that pretext is demonstrated by TSA's failure to keep her allegation of discrimination confidential, as required by TSA's Employee Manual and as evidenced by Weaver's comments.[189]

Reddy has adduced evidence sufficient to demonstrate that a genuine issue of material fact does exist as to the true reason for her termination. The trier of fact must determine whether Reddy was insubordinate. Moreover, a reasonable jury could surely find that insubordination was not the true reason for Reddy's termination. Reddy has demonstrated that retaliation could have been the basis for

---

[187]     Pl. 56.1 ¶ 164.

[188]     *See* Raksany Dep. at 111-13. Although TSA argues that Weaver's comment should be disregarded as inadmissible hearsay, at this stage in the litigation this statement is deemed an admission of a party opponent and is therefore admissible.

[189]     *See* TSA Eastern Territory Employee Manual, Ex. 6 to Korenbaum Decl. ("Any employee who believes that he or she has been wrongfully discriminated against or harassed on a basis prohibited by law is urged to report the incident. Reported incidents will be investigated on a confidential basis . . . .").

her termination. As a result, TSA's motion for summary judgment is denied as to Reddy's retaliation claim.

## V. CONCLUSION

For the reasons stated above, defendant's motion for summary judgment is granted as to Reddy's discrimination claim and denied as to Reddy's retaliation claim. The Clerk of the Court is directed to close this motion (document no. 40 on the docket sheet). A conference is scheduled for August 6, 2008, at 4:30 p.m.

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:     New York, New York
           July 18, 2008

49

## - Appearances -

**For Plaintiff**:

Scott A. Korenbaum, Esq.
111 Broadway, Suite 1305
New York, NY 10006
(212) 587-0018

**For Defendant**:

Cindy E. Molloy, Esq.
Tratner, Molloy & Goodstein LLP
551 Fifth Avenue, 20th Floor
New York, NY 10176
(212) 867-1100